IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BICC CABLES CORP. and ) <br> BALFOUR BEATTY, INC., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SCOTT & SCOTT, LLC, ) <br> DAVID R. SCOTT, ) <br> ROSS LAW FIRM, and ) <br> C. THOMAS ROSS, ) <br> ) <br> Defendants. ) <br> _____) | Civil Case No. _____ <br><br> JURY TRIAL DEMANDED <br><br> **COMPLAINT** |

Plaintiffs BICC Cables Corp. and Balfour Beatty, Inc. (collectively, "Balfour Beatty"), by and through their attorneys, Day, Berry & Howard, LLP and Mayer, Brown, Rowe & Maw LLP, for their complaint against defendants Scott & Scott, LLC, David R. Scott, Ross Law Firm, and C. Thomas Ross, allege as follows:

## **NATURE OF THE ACTION**

1. Balfour Beatty brings this malpractice suit because of the gross deviation by defendants (including, in particular, David R. Scott ("Scott") and C. Thomas Ross ("Ross")) from the standard of care required of ordinary members of the legal community.

2. In a startling prediction of what eventually would come to pass, in April 1997 defendants acknowledged that "under North Carolina Rules of Civil Procedure, if we do not respond to discovery, [plaintiff's attorney] would have to file a Motion to Compel our responses and, if we still did not respond, the Judge could enter Default Judgment against [Balfour

Beatty]." After more than two years of obstruction by defendants, their predictions became reality.

3. Defendants' actions were nothing short of egregious. Defendants, who were retained by Balfour Beatty to represent it in a routine breach of contract matter (the "Underlying Action") filed in December, 1996, inexplicably failed to respond adequately to basic discovery requests. After the plaintiff was forced to file several motions to compel, defendants *still* failed to comply with their discovery obligations. In August 1998, when the court ordered Balfour Beatty to provide adequate responses within 30 days, and "specifically ordered that all future filings be timely filed," defendants, rather than complying with the order, (1) filed a putative appeal of the order despite clear authority that it was not appealable, and (2) failed to obtain any stay of the court's order. Once the appellate court dismissed the appeal and ordered defendants to pay the plaintiff's costs, defendants waited an additional two months and only then served half-hearted responses to the discovery requests, more than six months after the original deadline imposed by the court.

4. Predictably, in July 1999, after more than two years of dilatory tactics by defendants, the court finally had enough: finding that defendants engaged in a "willful, intentional and egregious abuse of the Orders of this Court," the court sanctioned Balfour Beatty by striking its answer and counterclaims and entering a default judgment against it, leading directly to a damage award of $1.2 million in a case that even defendants admitted was frivolous.

5. As a direct and proximate result of defendants' malpractice, the allegations in the plaintiff's complaint were deemed admitted, defendants' malpractice vastly increased Balfour Beatty's exposure in the litigation, and Balfour Beatty has been forced to expend millions of dollars in order to mitigate and resolve its effects.

## PARTIES

6. Plaintiff BICC Cables Corp. is a Delaware corporation with its principal place of business in New York. At all times relevant to this Complaint, BICC Cables Corp. was engaged in the business of selling wire and cable.

7. Plaintiff Balfour Beatty, Inc. is a Delaware corporation with its principal place of business in Delaware. Balfour Beatty, Inc., is a holding company, and BICC Cables Corp. is a wholly-owned subsidiary of Balfour Beatty, Inc.

8. Upon information and belief, defendant Scott & Scott, LLC, is a limited liability company organized under the laws of the State of Connecticut; with a principal place of business in Colchester, Connecticut.

9. Upon information and belief, defendant David R. Scott is a resident of Connecticut and is the managing principal and shareholder of Scott & Scott, LLC.

10. Upon information and belief, defendant Ross Law Firm is a sole proprietorship organized under the laws of the State of North Carolina.

11. Upon information and belief, defendant C. Thomas Ross is a resident of North Carolina and is the sole owner of the Ross Law Firm.

## JURISDICTION AND VENUE

12. Jurisdiction for this action arises under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiffs and the defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13. Venue in this District is proper under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### A.   The Underlying Litigation

14.     In October of 1993, Brand Rex Company ("Brand Rex"), a division of plaintiff BICC Cables Corp., entered into a Sales Representative Agreement ("Agreement") with a company called Arthur, Harris & Associates, Inc. ("Arthur, Harris").

15.     Under the Agreement, Arthur, Harris agreed to operate as a sales representative for Brand Rex in five states in the southeastern United States. The Agreement provided that Arthur, Harris was entitled to commissions on certain sales under certain circumstances. The Agreement specifically delineated products and accounts for which Arthur, Harris would not earn any commissions, and it described circumstances on which sales commissions would be split among several parties.

16.     In February of 1995, Brand Rex terminated the Agreement by providing written notice of termination to Arthur, Harris.

17.     After the termination, Arthur, Harris believed that it was entitled to sales commissions for which it had not been paid. Arthur, Harris retained counsel ("William Harazin" or "Harazin"), who, as early as September 1995, wrote a demand letter to Brand Rex seeking to obtain Brand Rex's sales records in order to perform an accounting. These were the same documents that later became the subject of Arthur, Harris's motions to compel.

18.     To defend it against Arthur, Harris's claim, Balfour Beatty retained David R. Scott and Scott & Scott, LLC. Scott & Scott, LLC touts itself as a firm "committed to producing legal work of the finest professional quality," with lawyers "dedicate[d] . . . to practicing at the highest legal and ethical standards." Balfour Beatty believed that, in retaining David R. Scott

and Scott & Scott, LLC, it would receive, at the very least, competent and professional legal representation.

19.     In December 1996, Arthur, Harris sued Brand Rex (which, as defendants failed to observe, was merely a division of BICC Cables Corp. and not its own legal entity) in the Superior Court of Wake County, North Carolina.  The case was captioned *Arthur, Harris & Associates, Inc. v. Brand-Rex Company*, No. 96-CVS-013177.  Because, on information and belief, Scott considered removing the action to federal court only *after* the removal deadline had expired, Balfour Beatty was forced to litigate the case in North Carolina state court.

20.     In January 1997, Scott recommended to Balfour Beatty that it retain as co-counsel C. Thomas Ross of the Ross Law Firm, an attorney whom Scott claimed was "well known in the state" with "tremendous familiarity with the state court judges and the North Carolina judicial system."  Balfour Beatty accepted Scott's recommendation.  Balfour Beatty believed that, in retaining C. Thomas Ross and the Ross Law Firm, it would receive, at a minimum, competent and professional legal representation.

21.     Even before the lawsuit was filed, defendants recognized that the claims were meritless, advising Balfour Beatty that its *maximum* exposure in its dispute with Arthur, Harris – *including* exemplary damages and attorneys' fees – would be $200,000.

22.     Once the lawsuit was filed, defendants expressed even more confidence that Balfour Beatty would prevail, and that *Balfour Beatty*, and not Arthur, Harris, would recover damages.  Purporting to act in the name of the legally non-existent division Brand Rex, they asserted counterclaims in the Underlying Action and sought damages from Arthur, Harris principals in a separate action filed in federal court.  Defendants also considered filing a Rule 11 sanctions motion against Arthur, Harris on the ground that its claims were frivolous; and they

5

sounded the constant refrain that Balfour Beatty's exposure was negligible. Indeed, from the outset, defendants recommended a settlement for as little as $37,500, and filed an offer of judgment in that amount.

23.     Even Arthur, Harris apparently recognized the limits on its potential recovery. During 1997, Arthur, Harris was willing to settle the litigation for $150,000.

24.     Finally, defendants were aware of the importance of the litigation to Balfour Beatty. They were informed repeatedly by Balfour Beatty that an unfavorable outcome in the Underlying Action could result in duplicative, nationwide litigation by other sales representatives based on the same "standard issue" agreement that Arthur, Harris had entered into. Although defendants expressly acknowledged this risk in correspondence to Balfour Beatty, their actions, as demonstrated below, evidenced a complete disregard for that risk.

**B.      The Discovery Dispute**

25.     On March 10, 1997, Arthur, Harris served its first request for the production of documents. This standard discovery request sought computer-generated sales reports that would allow Arthur, Harris to determine the commissions to which it believed it was entitled. Under the North Carolina Rules of Civil Procedure, responses were due by mid-April of 1997.

26.     In relaying the requests to Scott on March 11, 1997, Ross observed that they "appear to be pretty straight-forward." With respect to timing, defendants' efforts to delay were obvious from the outset: Ross advised that "[w]e can attempt to delay but if Mr. Harazin files a motion to compel, he may very well prevail."

27.     On April 8, 1997, Ross wrote to Scott warning him that Balfour Beatty "should respond to [the discovery requests] on or before April 13, 1997," and that "we are running the risk of getting in trouble with the North Carolina court for failure to comply with discovery."

Ross further advised that "under North Carolina Rules of Civil Procedure, if we do not respond to discovery, Mr. Harazin would have to file a Motion to Compel our responses and, if we still did not respond, the Judge could enter Default Judgment against Brand Rex Company."

28. In the face of this warning, Scott did nothing. It was only on April 29, 1997 – weeks after Balfour Beatty's *response* was due to be served – that Scott first *reviewed* the discovery requests with Balfour Beatty. By that time, Arthur, Harris had already filed its first motion to compel.

29. On October 27, 1997, Arthur, Harris served its second set of document requests and first set of interrogatories. When Scott and Ross again refused to provide substantive responses to the requests, Arthur, Harris was forced to file its second motion to compel.

30. The court deferred ruling on the motion to compel until after counsel for Arthur, Harris had the opportunity to review Balfour Beatty's documents in Connecticut. In describing the results of the hearing to Scott, Ross reported that "[t]he Judge did indicate that we need to be forthcoming during our document production and reasonably comply with the rules of discovery or risk sanctions."

31. Despite the court's warning, Scott and Ross made no effort to organize Balfour Beatty's documents or to relate them in any way to the pending discovery requests. Rather, Scott and Ross subjected counsel for Arthur, Harris to a document dump of about 94 bankers boxes of documents consisting of over 244,000 pages of material.

32. After reviewing the undifferentiated universe of documents which did not include several requested documents, counsel for Arthur, Harris renewed its pending motion to compel. The court found Scott's and Ross's efforts glaringly insufficient, and it granted the motion to compel. The court filed an order on September 15, 1998 ("September Order" or "Order") that

7

compelled Balfour Beatty to make a proper response to Arthur, Harris's discovery requests by no later than October 15, 1998.  In its written order, the court "specifically ordered that all future filings be timely filed pursuant to the North Carolina Rules of Civil Procedure."

33.     Once again, Scott and Ross blatantly ignored the court's directive.  More than six months passed before they made their first meaningful effort to provide supplemental responses to the discovery requests.

**C.      The Putative Appeal**

34.     Rather than actually responding to Arthur, Harris's outstanding discovery requests, during this six-month period Scott and Ross instead investigated appealing the court's September Order.  However, billing records indicate that neither Scott nor Ross actually performed the necessary research on this issue.  Instead, Ross had his "legal assistant" research several of the most critical areas, including "appealability of discovery orders," the "applicability of Rule 33(c) and documents provided in lieu of interrogatories," the "Interlocutory Appeal," and the "Automatic Stay on Appeal."  Upon information and belief, this "legal assistant" was not licensed to practice law.

35.     It is a bedrock principle of North Carolina law that a discovery order, such as the September Order, is not immediately appealable.  Indeed, Scott and Ross knew (or should have known) that the Order was not appealable, because in a September 2, 1998 facsimile from Ross to Scott, Ross attached an excerpt from a leading treatise on North Carolina civil procedure, which explained the settled rule that "[a]n order compelling discovery is interlocutory, does not affect a substantial right, and is therefore not immediately appealable."

36.     It is equally clear under North Carolina law – and any competent attorney researching the issue would have determined – that taking a putative appeal of the September

8

Order would not absolve Balfour Beatty from the legal duty of complying with the Order, and would not result in an automatic stay. Rather, any competent attorney would have concluded that the Order remained in effect notwithstanding any appeal; that, pursuant to the Order, Balfour Beatty was required to serve discovery responses by no later than October 15, 1998; and that, if defendants wished to stay the Order to avoid being held in contempt for violating it, they needed to request such a stay from the court.

37. Scott and Ross knew (or should have known) of these basic principles because the treatise excerpt on North Carolina civil procedure that Ross faxed to Scott on September 2, 1998 sets forth this very point: "[t]he trial court has the discretion to stay the imposition of sanctions pending an appeal of a discovery order."

38. Even though defendants knew or should have known of North Carolina's well established law regarding the appealability of discovery orders, on September 28, 1998, Ross traveled to Raleigh and filed a putative appeal of the September Order. And even though they knew or should have known that the Order was not automatically stayed, Scott and Ross made no effort to comply with the October 15, 1998 deadline imposed by the court.

39. At the very least, defendants should have realized by no later than October 30, 1998 (fifteen days after the court-imposed deadline for compliance) that the Order was not stayed, because on that date, Arthur, Harris filed a motion for sanctions based on Balfour Beatty's failure to comply with the Order.

40. Notwithstanding this motion, defendants made no effort to comply with the Order or to seek clarification from the court as to whether its Order was stayed.

41. As defendants should have expected, on February 25, 1999, the North Carolina Court of Appeals entered an order dismissing Balfour Beatty's putative appeal of the September

9

Order on the ground that it lacked jurisdiction. It also ordered Balfour Beatty to pay Arthur, Harris's appellate costs.

**D.    Defendants' Careless Misreading of North Carolina's Mandate Rule**

42.    The North Carolina mandate rule transfers jurisdiction from the appellate court to the trial court under certain circumstances following an appellate judgment, but has no application when a putative appeal is dismissed for lack of jurisdiction. Any competent attorney researching the issue would have determined that the North Carolina mandate rule had no application to Balfour Beatty's appeal from – and the court's immediate dismissal of – the September Order.

43.    Nevertheless, Scott and Ross erroneously believed that the mandate rule applied, and that Balfour Beatty was not required to respond to discovery until after a mandate would have been issued by the appellate court had there been a judgment. Of course, there was no "judgment," and defendants' mistaken analysis was based on the flawed assumption that the court's September Order was stayed.

44.    Even assuming that the mandate rule had applied, any competent attorney reading North Carolina Rule of Appellate Procedure 32 would have discovered that the mandate period in North Carolina is 20 days. The Rule states unambiguously that "[u]nless a court orders otherwise, its clerk shall enter judgment and issue the mandate of the court 20 days after the written opinion of the court has been filed with the clerk."

45.    Defendants knew or should have known about the 20-day period in Rule 32, because Ross faxed Scott a copy of that Rule on March 1, 1999. Had either Scott or Ross actually read Rule 32, they never would have mistakenly assumed that the mandate period in North Carolina was 30 days.

46.     Even though the Rule was not susceptible to any other reading, defendants subsequently informed Balfour Beatty that "Mr. Ross incorrectly read the North Carolina Appellate Rule." This was not only an admission of negligence by defendants, but also gave Balfour Beatty the false impression that its attorneys actually read Rule 32.

47.     Compounding their negligent belief that the mandate rule applied following the dismissal of an appeal for lack of appellate jurisdiction with their negligent reading of Rule 32, Scott and Ross erroneously believed that Balfour Beatty was entitled to at least 30 days following the February 25, 1999 dismissal of the appeal before responding to discovery.

48.     Moreover, and remarkably, Scott and Ross believed that there was an *additional* 30-day period that could be added to their erroneous application of a 30-day mandate period, thus providing Balfour Beatty with an additional *60 days* following the dismissal of the appeal to comply with the September Order. Defendants' deeply flawed analysis that April 25, 1999 was the deadline for complying with the Order was based on a combination of mistaken beliefs that (i) the Order was appealable, (ii) the Order was automatically stayed pending appeal; (iii) the mandate rule applied to Balfour Beatty's frivolous appeal; (iv) the mandate period was 30 days; and (v) the Order requiring compliance within 30 days, and specifically directing that "all future filings be timely filed pursuant to the North Carolina Rules of Civil Procedure," actually meant that Balfour Beatty could comply only *after* an appeal was filed and dismissed, only *after* a non-existent mandate period expired, and only *after* another 30 days passed.

49.     No competent attorney would have made *any* of these baseless conclusions, much less all of them. And no reasonable attorney, in light of the court's unambiguous September Order, would have taken the risk of not complying with the order by October 15, 1998, or not seeking a stay of that Order.

11

50. Scott and Ross, however, took precisely that risk. It was not until April 1999 that defendants *began* taking meaningful steps to provide responses to Arthur, Harris's discovery requests.

51. By April 26, 1999, the date of the hearing on Arthur, Harris's motion for sanctions, defendants still had not completed their document production.

52. Between the date of the sanctions hearing and the date of the court's ruling on Arthur, Harris's motion, Ross traveled to Connecticut for at least three days to conduct duties necessary to his representation of Balfour Beatty.

53. On July 28, 1999, the court ruled on Arthur, Harris's motion for sanctions. As defendants had anticipated more than two years earlier, the court imposed the ultimate sanction: it entered default judgment against Balfour Beatty and ordered that its answer and counterclaims be stricken.

54. On August 3, 1999, five days after receiving notice of the default judgment, Ross sent his monthly billing statement to Brand Rex's offices in Connecticut. In his cover letter, Ross did not inform Balfour Beatty that a default judgment had been entered. Instead, presumably in an effort to justify his fees, Ross characterized the status of the case as follows: "The case continues to be embroiled in a discovery dispute of major proportions, which is taking quite a bit of time to deal with."

55. In a formal order filed on August 26, 1999, the court recounted the history of defendants' discovery abuses, and then concluded as follows:

> The Defendant's failure to comply with the August 26, 1998 Court Order [which was filed on September 15, 1998] not only compelling Defendant's response, but also failing to do so in a timely manner shows a willful, intentional and egregious abuse of the Orders of this Court without any justification being provided by the Defendant for its conduct. . . .

> The Defendant's failure to comply with the Rules of Civil Procedure as they pertain to discovery, answers and other matters, as indicated by a review of the history of this lawsuit, is further evidence of a willful, intentional and egregious abuse of the Rules of this Court without any justification being provided by the Defendant for its conduct. . . .
>
> The August 26, 1998 Court Order compelling Defendant's response, specifically provided that all future filings be timely filed pursuant to the North Carolina Rules of Civil Procedure.

56.     The court found that "the Defendant has willfully and intentionally failed to obey the Orders of this Court . . . and such failure is egregious enough to justify the sanctions of striking the Defendant's answers and counterclaims and entering judgment by default against the Defendant." The court ordered that Arthur, Harris was entitled to collect damages, exemplary damages and attorneys' fees in an amount to be determined at a subsequent hearing.

### E.     The Default Sanction Proximately Caused A $1.2 Million Damage Award Against Balfour Beatty

57.     In a memorandum to Balfour Beatty dated February 23, 2000, Scott creatively characterized why the default judgment had been entered. Specifically, Scott told Balfour Beatty that "[w]hile our appeal was pending, we were not required to comply with the court's order" and claimed that Balfour Beatty had been sanctioned because "our discovery responses were ten (10) days late." Scott had no reasonable legal or factual basis for making those statements.

58.     In that same memorandum, Scott described the effect of the default sanction in grossly misleading terms. Specifically, Scott told Balfour Beatty that "[a]t the damages hearing, we should still be able to raise all the defenses we previously pled." Scott had no reasonable legal or factual basis for making that statement.

59.     During May and June of 2000, the court conducted a damages hearing.

60.     Pursuant to the default sanction, at the damages hearing, Balfour Beatty was denied a right to a jury trial. According to the court, "it's not the Court's taking away of rights of

the Defendant, but the Defendant, by its prior action or inaction, waived or gave up or lost those rights, at least to the extent as so ordered by Judge Johnson."

61. Moreover, all of the allegations in Arthur, Harris's amended complaint were deemed admitted, and Balfour Beatty's defenses were stricken. As the court noted, "to allow you, Defendant, to offer evidence contradicting those allegations would be obviating the effect of the order's dismissal."

62. Balfour Beatty was also precluded from admitting evidence at the hearing that supplemented or contradicted its insufficient discovery responses: "Defendants shall not be allowed to put on evidence that contradicts or adds to any of Defendant's discovery responses, or that was not produced in discovery in accordance with Rules of Civil Procedure . . . ."

63. As a result of that hearing, and as a direct and proximate result of defendants' negligence, the court determined that Arthur, Harris was entitled to $1.2 million in damages, exemplary damages, and attorneys' fees.

64. As a direct and proximate result of defendants' negligence, Balfour Beatty was forced to settle the litigation with Arthur, Harris for a substantial sum, far in excess of the $150,000 representing Arthur, Harris's settlement demand before defendants' negligence.

65. As a direct and proximate result of defendants' negligence, Balfour Beatty was required to retain Womble, Carlyle, Sandridge & Rice and Mayer, Brown, Rowe & Maw LLP, and to incur substantial costs, to mitigate the effects of defendants' negligence.

66. Balfour Beatty's attorney-client relationship with all of the defendants ended no sooner than February 10, 2003.

## VIOLATIONS ALLEGED

### COUNT I (All Defendants — Negligence)

67.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68.     Defendants, including in particular Scott and Ross, owed Plaintiffs a duty to exercise the degree of skill commonly exercised by an ordinary member of the legal community.

69.     Defendants, including in particular Scott and Ross, breached that duty to Plaintiffs by, *inter alia*, the acts and omissions set forth in detail above.

70.     As a direct and proximate result of defendants' negligence, Plaintiffs have suffered damages in an amount to be determined at trial.

## CLAIM FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     Compensatory damages in an amount to be determined at trial;

B.     Plaintiffs' costs, disbursements and reasonable attorneys' fees in connection with this action; and

C.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand that all issues presented by this lawsuit that are properly triable by a jury be so tried.

Dated: September 15, 2004

                        BICC CABLES CORP. and BALFOUR BEATTY, INC.

                        By: _____
                              David J. Elliott (CT 04301)
                              Day, Berry & Howard LLP
                              CityPlace I
                              Hartford, Connecticut 06103-3499
                              (860) 275-0196
                              Attorneys for Plaintiffs

Of Counsel:

Gary D. Friedman
Matthew D. Ingber
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, NY 10019
(212) 506-2500